UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 05-999(DSD/SRN)


MSK EyEs LTD and
Muhannah S. Kakish,

          Plaintiffs,

v.                                                    **ORDER**

Wells Fargo Bank, National
Association,

          Defendant.


     Damon L. Ward, Esq., Lateesa T. Ward, Esq. and Ward &
     Ward, 2915 Wayzata Boulevard, Minneapolis, MN 55404,
     counsel for plaintiffs.

     Richard T. Thomson, Esq. and Lapp, Libra, Thomson,
     Stoebner & Pusch, 120 South Sixth Street, Suite 2500,
     Minneapolis, MN 55402, counsel for defendant.


     This matter is before the court upon defendant's motion for
summary judgment.  Based upon a review of the file, record and
proceedings herein, and for the reasons stated, the court grants
defendant's motion.


                              **BACKGROUND**

     This action arises out of a lending transaction between
defendant Wells Fargo Bank National Association ("Wells Fargo") and
plaintiffs Muhannah S. Kakish ("Kakish") and MSK EyEs Ltd. ("MSK").
In 2001, MSK signed a promissory note on a $35,000 loan from Wells
Fargo.  Kakish and his brother, Raed Kakish ("Raed"), personally

guaranteed the MSK loan.  Within three months, MSK defaulted on the loan and overdrew its Wells Fargo checking account, causing checks issued by MSK on the account to be returned without payment.  On November 2, 2001, Wells Fargo sued MSK and Kakish in Minnesota state court, Ramsey County, to collect overdraft charges on the MSK checking account.  On November 9, 2001, Wells Fargo sued MSK, Kakish and Raed in Minnesota state court, Hennepin County, to recover the outstanding principle, interest and attorneys fees related to the defaulted MSK loan.  Wells Fargo, MSK and Kakish settled their disputes in the Hennepin County litigation pursuant to a document entitled Mutual Release.  A default judgment was entered against only MSK in the Ramsey County litigation.  MSK and Kakish commenced this action against Wells Fargo alleging a myriad of state law claims premised upon Wells Fargo's alleged breach of the terms of the Mutual Release.[1]

Kakish incorporated MSK in the state of Minnesota in October 2000 to develop a chain of retail eyeware stores.  MSK originally aspired to open 50 retail stores in five years and 495 stores in ten years but has yet to open one store.  (Kakish Dep. at 572; Thomson Aff. Exs. 3, 21.)  Kakish is the founder, president, chairman of the board and majority shareholder of MSK.  Leroy Miller ("Miller") is Kakish's domestic partner, who has at times

---

[1]  Plaintiffs have voluntarily withdrawn counts 1, 2 and 4 of the first amended complaint, each of which alleged violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681s-2b, i(a).

lived with Kakish, invested in MSK and allowed MSK to operate out of property owned by Miller.  (Kakish Dep. at 140-44.)  Miller is the sole owner, director and employee of Leroy Miller Design, Inc. On August 18, 2004, Leroy Miller Design voluntarily petitioned for Chapter 7 Bankruptcy and, on that date, reported owning a 0.6% interest in MSK.

In response to the Hennepin County litigation, MSK and Kakish asserted counterclaims against Wells Fargo for breach of contract, deceptive and unlawful trade practices, libel and slander.  (See Thompson Ex. 5.)  MSK and Kakish further alleged that Wells Fargo caused in excess of $40,000 in third-party checks drawn on the MSK account to be dishonored by failing to timely process the $35,000 loan.  In addition, according to Kakish and MSK, when third parties contacted Wells Fargo regarding the dishonored checks, a Wells Fargo loan officer made disparaging remarks about Kakish's qualities as a businessman and the fraudulent nature of MSK, causing the company to lose "several lucrative business opportunities."  (Id. at ¶ 11.)

On July 11, 2002, Wells Fargo, Kakish and MSK settled their claims in the Hennepin County litigation pursuant to the terms of the Mutual Release, which provides in relevant part that in consideration for a $1,000.00 payment from Kakish and the release of all claims asserted by Kakish and MSK against Wells Fargo,

> [Wells Fargo] does hereby release and forever
> discharge Muhannah S. Kakish ... of and from

> each and every claim, demand, liability and
> cause of action ... which Wells Fargo ever
> had, presently has or claims to have against
> MSK EyEs Ltd., Muhannah Kakish [or their
> agents, successors and assigns] ... including
> but not limited to those that relate in any
> way to Wells Fargo's April 5, 2001 claims
> against MSK EyEs, Ltd. pursuant to [the
> $35,000] promissory note dated April 5, 2001
> ... and the personal guaranty of Muhannah S.
> Kakish dated April 5, 2001 guarantying the
> obligations of MSK EyEs, Ltd. to Wells Fargo.

(Thomson Aff. Ex. 6.)   Wells Fargo did not release its claims against MSK or Raed.  According to Wells Fargo, it did not release MSK from the loan because a release of the underlying loan may have jeopardized successfully obtaining payments from Raed as a personal guarantor.  (Johnson Dep. at 41.)  The parties stipulated that the terms of the settlement were confidential and not to be disclosed to anyone except, among others, "the corporate directors, officers or shareholders of Wells Fargo and MSK EyEs Ltd."  (Id.)  The parties further agreed not to comment on the resolution of their disputes if contacted by third-parties other than to say the parties disputed and resolved their liabilities in good faith. Following the settlement, Wells Fargo posted a note on the MSK account that stated in all capitalized letters: "Do not give any information on this customer out to anyone, if any callers claim to be customer please refer them to [an officer] right away!!!" (Johnson Aff. Ex. 1; Johnson Dep. at 67.)

Pursuant to a stipulation signed by Wells Fargo, MSK and Kakish, the Hennepin County District Court dismissed all claims

4

among the parties with prejudice on July 15, 2002.  (Thomson Aff. Ex. 9.)  The parties acknowledged that the stipulation relating to MSK and Kakish did not constitute a waiver of Wells Fargo's causes of action against Raed or an agreement to dismiss Wells Fargo's claims against Raed.  Raed ultimately defaulted in the Hennepin County litigation, and a judgment for $54,349.26 was entered against him.  However, Wells Fargo and Raed settled their claims following entry of the default judgment.  In June 2003 Wells Fargo agreed to vacate the judgment, and Raed agreed to pay $3,200 towards the MSK loan in twenty-one monthly payments of $150 from July 15, 2003, until March 15, 2005.  (See id. Ex. 10.)  Wells Fargo and Raed further agreed that if Raed defaulted in making his $150 payments the full outstanding balance on the MSK loan would immediately become due and payable.  (Id.)

Wells Fargo maintained the MSK account as active on its books. The account records reflected monthly interest accrued, the $1,000 payment from Kakish and subsequent $150 payments received from Raed.  (Johnson Aff. ¶ 4; Thomson Aff. Ex. 12.)  According to Wells Fargo, the MSK account remained active on the system until the bank received Raed's final settlement payment in March 2005.  (Johnson Dep. at 79-80; Johnson Aff. ¶ 4.)  The MSK account remained active so that Wells Fargo had an account to credit the settlement payments towards and because, under the terms of the settlement agreement, the entire outstanding balance would become collectible

from Raed if he defaulted on the $150 payments. (Johnson Aff. ¶ 4.) Wells Fargo sent MSK monthly statements on the MSK account throughout this time period reflecting the outstanding balance, interest accrued and payments received.  However, Kakish disputes in which months he received such statements.

Despite resolving the Hennepin County litigation, neither MSK nor Kakish filed an answer to Wells Fargo's complaint in the Ramsey County collection action for overdraft charges on the MSK checking account.  (Weber Aff. Ex. 1.)  On October 14, 2002 — after Wells Fargo, Kakish and MSK settled the Hennepin County litigation and executed the Mutual Release — Wells Fargo requested that default judgment be entered in the Ramsey County litigation against "MSK EyEs LTD ONLY" because the checking account was only in MSK's name. (Weber Aff. ¶ 3; Ex. 2.)  On November 4, 2002, the Ramsey County District Court entered judgment against MSK in the amount of $1,634.02.  (Id. Ex. 3.)  MSK never challenged or appealed the Ramsey County judgment.  Wells Fargo served six garnishment summons on Community First National Bank ("Community First") between June 13, 2003, and June 5, 2006, and collected a total of $248.13 towards the Ramsey County judgment.  (Id. ¶ 7, Ex. 4.)

During early 2004 Kakish was out of the country for several months.  Miller had power of attorney for Kakish while he was away and lived at the same address where MSK received its mail. (Miller Dep. 90-91.)  Miller was also on MSK's board of directors, and he

opened MSK's mail while Kakish was out of town in his capacity as a board member.  While opening the mail, he noticed statements to MSK from Wells Fargo referencing an outstanding balance on the MSK account as well as notices of the garnishments Wells Fargo served on Community First.  (Id. at 95.)

In September 2004, Miller contacted Wells Fargo regarding the MSK account.  A Wells Fargo officer told Miller that he needed a signed authorization to release information before the bank could provide him any information regarding the MSK account.  (Id. at 133.)  Miller then told Kakish that he had contacted Wells Fargo to inquire about the MSK account and that he needed written authorization.  (Id. at 137-38.)  Kakish wrote a letter dated September 20, 2004, "[t]o whom it may concern" stating: "I hereby authorize Wells Fargo Bank to release information relating to MSK EyEs Ltd. and/or Muhannah S. Kakish and related accounts to Leroy Miller Design Inc."  (Thomson Aff. Ex. 14.)

Miller then faxed Wells Fargo the following request on the company letterhead of Leroy Miller Design:

> Please provide a reference for MSK EyEs Ltd. and/or Muhannah Kakish.  A release for the information should be on file at this time. Please fax information to Leroy Miller Design, Inc.

(Thomson Aff. Ex. 15.)  On October 11, 2004, in response to the written authorization signed by Kakish and the reference request from Leroy Miller Design, Wells Fargo faxed the following

7

information to the fax number provided by Miller: the current balance ($31,750.00), opening balance ($35,000.00), opening date (April 5, 2001), interest rate (7.75%), maturity date (July 31, 2001) and the amount of monthly payments ($150). (Thompson Aff. Ex. 16.) Wells Fargo accompanied this information with the following disclaimer:

> By accepting this information, you warrant that receipt by you is lawful, you agree that it will not be disclosed to anyone else or used in an unlawful manner, you acknowledge that its completeness and accuracy is not guaranteed, it may not disclose the entire relationship of the customer with the bank and is subject to change without notice, and you agree to indemnify and hold the bank harmless against all loss resulting from providing this information to you.
>
> Wells Fargo is not responsible for the information included in this fax being viewed by persons other than the intended recipient upon printing at this fax number.

(Id.)

At the time Miller received the requested information, Leroy Miller Design had already filed for Chapter 7 bankruptcy, and the only impact receipt of the information had on Miller personally was that it dampened his enthusiasm to seek new investors for MSK. (Miller Dep. at 172-74.) Miller does not know whether anyone would have invested in MSK had Wells Fargo not disclosed the above information to him. (Id.)

After receipt of the letter from Wells Fargo, Kakish and Miller told other individuals — including directors, shareholders,

8

consultants and potential investors in MSK — about the garnishment proceedings that resulted from the Ramsey County litigation and that Wells Fargo continued to send MSK statements regarding the $35,000 loan that formed the basis of the Hennepin County litigation and was attempting to collect on the loan. (<u>See</u> Thomson Aff. Ex. 18; Kakish Aff. ¶¶ 25-31.)  Plaintiffs allege that as a result of the self-publication of that information MSK and Kakish have incurred damages in the form of lost revenues and profits in excess of $4.2 million dollars.

In this action, MSK and Kakish assert state law claims of credit defamation, business disparagement, defamation, interference with prospective business advantage and economic expectancy, violation of the Minnesota Garnishment Statute and negligence. Plaintiffs contend that (1) Wells Fargo disclosed a false debt when it obtained the Ramsey County default judgment and garnished funds from Community First because the issue of the overdraft fees that were the basis of the Ramsey County judgment was raised and dismissed in the Hennepin County litigation, (2) Wells Fargo inaccurately maintained the MSK credit-line account on its books because MSK had been relieved from its obligation to pay the debt pursuant to the Mutual Release and (3) Wells Fargo wrongfully communicated the account information to Leroy Miller Design.  Wells Fargo now moves for summary judgment on all claims.

**DISCUSSION**

## I.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial.  See Celotex, 477 U.S. at 324.

## II.  Rooker-Feldman Doctrine

Wells Fargo first argues that under the Rooker-Feldman doctrine[2] the court is without jurisdiction to address plaintiffs'

---

[2]  See D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983); Rooker v. Fid. Trust Co., 263 U.S. 413 (1923).

claims to the extent they directly and indirectly challenge the validity and enforceability of the Ramsey County judgment.  The Rooker-Feldman doctrine is implicated when a federal action is commenced by "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobile Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).  Under the doctrine, federal district courts are without jurisdiction to review state court judgments or to address federal claims with allegations that are inextricably intertwined with a state court decision.  Prince v. Ark. Bd. of Exam'rs in Psychology, 380 F.3d 337, 340 (8th Cir. 2004).  However, if a federal plaintiff presents an independent claim, even "one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." Exxon, 544 U.S. at 293.

The Rooker-Feldman doctrine "bars both straightforward and indirect attempts by a plaintiff to 'undermine state court decisions.'" Prince, 380 F.3d at 340 (quoting Lemonds v. St. Louis County, 222 F.3d 488, 492 (8th Cir. 2000)).  A claim is inextricably intertwined under Rooker-Feldman if it "succeeds only to the extent that the state court wrongly decided the issues before it [or] if the relief requested ... would effectively

11

reverse the state court decision or void its ruling." _Fielder v. Credit Acceptance Corp._, 188 F.3d 1031, 1034-35 (8th Cir. 1999). A nonprevailing party in state court cannot bring claims in federal court that allege "'injury caused by the state-court judgment.'" _Mosby v. Ligon_, 418 F.3d 927, 931 (8th Cir. 2005) (quoting _Exxon Mobil_, 544 U.S. at 292); _see also Hoblock v. Albany County Bd. of Elections_, 422 F.3d 77, 87-88 (2d Cir. 2005) (third-party action produced by state court judgment barred by _Rooker-Feldman_); _Kenmen Eng'g v. City of Union_, 314 F.3d 468, 476 (10th Cir. 2002) (_Rooker-Feldman_ applies if "state-court judgment caused, actually and proximately, the injury for which the federal-court plaintiff seeks redress."). The fact that a judgment was entered on a party's default does not alter the applicability of the _Rooker-Feldman_ doctrine and renders the court without jurisdiction over defenses to the state court action that the defaulting party failed to raise. _See Fielder_, 188 F.3d at 1035 (federal district court cannot amend state court default judgment based on claims and defenses losing party failed to raise).

In this case, plaintiffs' breach of contract claim alleges that Wells Fargo breached the terms of the Mutual Release by obtaining the Ramsey County judgment. Plaintiffs' defamation, credit defamation and business disparagement claims allege that Wells Fargo defamed plaintiffs when it collected on the Ramsey County judgment through garnishment. Plaintiff's tortious

interference claim alleges that Wells Fargo impermissibly interfered with MSK's business relations when it collected on the Ramsey County judgment. For each claim, MSK and Kakish seek to recover damages in this action for injuries incurred as a direct result of Wells Fargo successfully obtaining and enforcing a state court judgment.

To permit MSK and Kakish to collect damages as a result of Wells Fargo's procurement and enforcement of the Ramsey County judgment would in effect reverse the judgment and void its result by penalizing Wells Fargo for obtaining it and precluding Wells Fargo from enforcing it. Therefore, to the extent plaintiffs' breach of contract, defamation, credit defamation, business disparagement and tortious interference claims seek damages directly arising out of the Ramsey County default judgment, the court dismisses those claims with prejudice for lack of jurisdiction under Rooker-Feldman.[3]

---

[3]   Even if the court construed plaintiffs' claims to be independent from the Ramsey County litigation and subject to neither the Rooker-Feldman doctrine nor res judicata, the claims would fail. First, Kakish has no meritorious claim based on the Ramsey County litigation because Wells Fargo did not obtain a judgment against him. Second, MSK's claims would fail because although Wells Fargo settled the Hennepin County litigation with MSK over the $35,000 loan, Wells Fargo did not release its claims against MSK, release MSK from the loan or covenant not to sue MSK on the overdraft charges on its checking account. (See Thomson Aff. Ex. 6.)

### III.   Breach of Contract

Having dismissed plaintiffs' breach of contract claim to the extent it challenges the Ramsey County judgment, plaintiffs further allege that Wells Fargo breached the terms of the Mutual Release when it sent MSK statements on the account that reflected a balance on the MSK loan and disclosed the status of the MSK loan to Leroy Miller Design.  However, Kakish's breach of contract claim fails because he has not identified any information maintained or disclosed by Wells Fargo that relates to him as a personal guarantor on the loan or the settlement of Wells Fargo's claims against him in the Hennepin County litigation.  MSK's breach of contract claim also fails because maintaining the account on Wells Fargo's books and sending MSK statements to reflect payments towards the account did not breach any of the terms of the Mutual Release.  As to the disclosure to Leroy Miller Design, Wells Fargo released the account information pursuant to MSK's express authorization.  Further, the information released related only to the current account status, did not mention any prior litigation or the terms of the parties' settlement or the Mutual Release and contained an express disclaimer that the information did not disclose "the entire relationship of the customer with the bank." (Thompson Aff. Ex. 16.)  For these reasons, Wells Fargo is entitled to summary judgment on plaintiffs' breach of contract claims.

IV.   **Defamation and Credit Defamation Claims**[4]

Plaintiffs assert claims of defamation and credit defamation based on the garnishment in the Ramsey County litigation, which the court has now dismissed under Rooker-Feldman, as well as the following statements: the October 11 fax from Wells Fargo to Leroy Miller Design and the statements Wells Fargo sent to MSK reflecting the MSK account balance.   According to plaintiffs, following the Hennepin County settlement and stipulated dismissal, the MSK account balance should have been $0.00 and any disclosure to the contrary was defamatory.   Plaintiffs allege that they were required to self-publish to potential investors that Wells Fargo's internal records continued to reflect an outstanding amount on the MSK loan and that Wells Fargo was trying to collect on the loan.

To succeed on a defamation claim, a plaintiff must establish that a false statement was communicated to someone other than the plaintiff and harmed the plaintiff's reputation or lowered him in the "estimation of the community." Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 256 (Minn. 1980).   Under certain circumstances, a plaintiff can establish the publication requirement if "compelled to publish a defamatory statement to a third person" and "it was foreseeable to the defendant that the

---

[4]      Although plaintiffs pleaded a credit defamation claim, neither party has identified any facts or cited any legal authority apart from the facts and case law relevant to plaintiffs' defamation claims.   Therefore, the court analyzes both claims under the Minnesota law of defamation.

plaintiff would be so compelled." Lewis v. Equitable Life Assurance Soc'y, 389 N.W.2d 876, 888 (Minn. 1986). The doctrine of self-publication is to be "cautiously applied." Id.

A defamatory statement can be conditionally privileged if "made upon a proper occasion, from a proper motive, and ... based upon reasonable or probable cause." Stuempges, 297 N.W.2d at 256-57. To establish a qualified privilege, a defendant must show the statement was made "in good faith by a speaker who had an interest or duty with respect to the subject matter to a person having a corresponding interest or duty." Ferrell v. Cross, 557 N.W.2d 560, 565 (Minn. 1997). If a defendant can establish the existence of a conditional privilege, a plaintiff then has the burden to prove the privilege was abused, which requires a showing of actual malice. Stuempges, 297 N.W.2d at 257. To establish malice, a plaintiff must demonstrate the defendant "made the statement from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." Id. (internal quotations omitted).

In this case, Kakish has not identified any false information that Wells Fargo disclosed to a third-party about him personally that lowered his estimation in the community. Therefore, Kakish's defamation and credit defamation claims fail.

As to MSK's defamation claims, the mailing to MSK of its monthly account statements to reflect an updated balance is entitled to a conditional privilege because the bank statements

were made upon a proper occasion from a proper motive based on
probable cause.  Similarly, the fax to Leroy Miller Design is
conditionally privileged because the disclosure pursuant to MSK's
express authorization was also made upon a proper occasion from a
proper motive based on probable cause.  Wells Fargo has established
that both statements are conditionally privileged, and MSK has
identified no evidence of malice to indicate that the respective
privileges were abused.

Furthermore, MSK was not compelled to publish information
regarding a debt that had been dismissed with prejudice and was no
longer be collected against MSK or Kakish — whether via account
statements or the release of information — and such self-
publication would not have been foreseeable to Wells Fargo under
the circumstances of this case.  Moreover, the account statements
at issue in this litigation accurately reflected the status of the
MSK account balance from Wells Fargo's perspective in light of the
pending settlement payments from Raed.  The gravamen of plaintiffs'
defamation claims is that the statements and the fax implied that
MSK continued to owe funds.  However, plaintiffs have provided no
evidence that Wells Fargo made any statement to any individual or
entity that it was collecting on the debt against MSK or Kakish or
that MSK or Kakish had an outstanding, collectible obligation.  For
all these reasons, summary judgment in favor of Wells Fargo is
warranted on MSK's defamation and credit defamation claims.

17

**V.   Business Disparagement Claim**

MSK pleaded a claim of business disparagement, and Wells Fargo moves for summary judgment on that claim.  However, neither party identified facts or legal authority to indicate that MSK's business disparagement claim is distinct from its claims for defamation and credit defamation.   Under Minnesota law, a person engages in business disparagement when in the course of business or occupation he or she "disparages the goods, services, or business of another by false or misleading representation of fact."   <u>Northwest Airlines, Inc. v. Friday</u>, 617 N.W.2d 590, 595 (Minn. Ct. App. 2000) (quoting Minn. Stat. § 325D.44, subd. 1(8)).  MSK has identified no facts or legal authority apposite to its business disparagement claim apart from the facts discussed above.  Therefore, the court concludes that to the extent MSK asserts a business disparagement claim in this litigation any such claim fails for the reasons MSK's defamation and credit defamation claims fail.

**VI.  Tortious Interference and Negligence Claims**

Apart from the allegations relating to the Ramsey County judgment, plaintiffs claim that the October 11 fax to Leroy Miller Design disclosed a nonexisting debt and tortiously interfered with MSK's prospective economic advantage in the market.  Similarly, plaintiffs claim that Wells Fargo was negligent because it failed to correctly extinguish from its accounts a satisfied debt and disclosed false information regarding the debt to third parties.

However, regardless of creative labeling, claims that arise out of purported defamatory statements are properly analyzed under the law of defamation.  See Mahoney & Hagberg v. Newgard, 729 N.W.2d 302, 309-10 (Minn. 2007) (privileges applicable to certain defamatory statements apply to any claims "where the injury stemmed from and grew out of the defamation"); Wild v. Rarig, 234 N.W.2d 775, 793 (1975) ("regardless of what the suit is labeled, the thing done to cause any damage to [plaintiff] eventually stems from and grew out of the defamation"); Zagaros v. Erickson, 558 N.W.2d 516, 523 (Minn. Ct. App. 1997) (rejecting negligence label of claim sounding in defamation).  Plaintiffs' tort claims are based on the identical statements that form the basis of their defamation claims, and the court has concluded each of those statements are conditionally privileged.[5]  Therefore, summary judgment in favor of Wells Fargo is warranted on plaintiffs' tortious interference and negligence claims.

---

[5]  Even if the court did not conclude that plaintiffs' tort claims sound in defamation, each claim would fail on its merits. Plaintiffs have failed to establish that Wells Fargo wrongfully interfered with MSK's business expectation without justification or that Wells Fargo was negligent in maintaining account information to reflect ongoing settlement payments or disclosing information pursuant to an express, written authorization.  See Lamminen v. City of Cloquet, 987 F. Supp. 723, 731 (D. Minn. 1997) (elements of wrongful interference claim under Minnesota law); Engler v. Ill. Farmers Ins. Co., 706 N.W.2d 764, 767 (Minn. 2005) (elements of negligence claim under Minnesota law).

## VII.   Minnesota Garnishment Action

Plaintiffs allege Wells Fargo garnished their funds in bad faith and in violation of Minnesota Statutes chapter 571 because MSK and Kakish did not owe the debt garnished and the garnishment was towards the Ramsey County judgment that plaintiffs assert was obtained by Wells Fargo in violation of the terms of the Mutual Release.  See Minn. Stat. § 571.90.  Plaintiffs also allege Wells Fargo did not pay the $15 fee required under Minnesota Statutes section 571.76.  However, the evidence of record establishes that Wells Fargo paid the statutory fee.  (Weber Aff. ¶ 8.)  Other than plaintiffs' legal challenges as to whether enforcement of the Ramsey County judgment through garnishment breached the Mutual Release, which the court has dismissed under Rooker-Feldman, plaintiffs present no evidence that Wells Fargo garnished MSK's funds in bad faith.  Therefore, Wells Fargo is entitled to summary judgment on MSK's garnishment claim.

## CONCLUSION

Based upon the file, record and proceedings herein, and for the reasons stated, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. No. 69] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 3, 2007

s/David S. Doty
David S. Doty, Judge
United States District Court